**Michael BYARD, Plaintiff,**

**v.**

**QUALMED PLANS FOR HEALTH, INC., f/k/a Greater Atlantic Health Service, Inc., QualMed Plans for Health of PA, Inc., f/k/a Greater Atlantic Health Service, Inc., and Greater Atlantic Health Service, Inc., Defendants.**

**Civil Action No. 96–8338.**

United States District Court,
E.D. Pennsylvania.

May 29, 1997.

Gregory B. Heller, Joseph F. Ricchiuti, Litvin, Blumberg, Matusow & Young, Philadelphia, PA, for Plaintiff.

Amalia V. Romanowicz, Post & Schell, P.C., Philadelphia, PA, for Defendants.

## MEMORANDUM

JOYNER, District Judge.

Plaintiff Michael Byard ("Plaintiff") instituted this action against Defendants QualMed Plans for Health, Inc., f/k/a Greater Atlantic Health Service, Inc., QualMed Plans for Health of PA, Inc., f/k/a Greater Atlantic Health Service, Inc., and Greater Atlantic Health Service, Inc. (collectively "Defendant" or "Greater Atlantic") on November 7, 1996 in the Court of Common Pleas for Philadelphia County. The Complaint seeks damages under Pennsylvania law for Defendant's alleged failure to timely precertify Plaintiff for surgery. Defendant removed the case to this Court pursuant to a Notice of Removal filed December 16, 1996. Defendant contends that Plaintiff asserts a claim for benefits under an employee welfare benefit plan governed by the Employee Retirement Security Act of 1974, 29 U.S.C. §§ 1001 *et seq.* ("ERISA"). Before the Court is Plaintiff's Motion to Remand this matter to the Court of Common Pleas for Philadelphia County. For the following reasons, the Motion is granted.

## FACTS

Plaintiff suffers from a skin condition known as dissecting cellulitis. He alleges that in the summer of 1994 he was advised that surgical treatment of his condition was medically necessary, but that his HMO, Defendant Greater Atlantic, refused to precertify the surgery. Despite repeated confirmations of this diagnosis, Greater Atlantic allegedly did not approve treatment until the fall of 1995. Plaintiff contends that because of the delay, the surgery was more serious, less effective, and had more disfiguring consequences than would have occurred had Greater Atlantic approved the surgery in the summer of 1994. Plaintiff brought this action in the Court of Common Pleas for Philadelphia County seeking compensatory and punitive damages under Pennsylvania tort law. Defendant removed the case to federal court claiming jurisdiction under ERISA, but Plaintiff challenges this contention in the instant Motion to Remand. The fact-intensive inquiry called for by Plaintiff's Motion requires a thorough examination of the funding and administration of program under which Plaintiff was insured. We therefore begin by reciting our factual findings in this case.

In 1992, Plaintiff, an electrician and electrical equipment operator, went into the electrical contracting business with his brothers Jeffrey, Chris, Marlon and Kevin.[1] Byard Signal and Lighting ("Byard Signal") was formed, with Jeffrey and Chris as its shareholders and Jeffrey as its President. The business was not successful. Byard Signal collected no revenue in either 1992 or 1993 and did only "several small little jobs" in 1994. 1/28/97 Dep. of Jeffrey Byard at 52. Business picked up in 1995, but ground to a halt again by the end of 1996. In short, Byard Signal was a "part-time venture that never ... got off and going." *Id.* at 67.

---

1. It is the general practice of this Court in our memoranda to refer to individuals by their surnames. In this case, however, because of the number of Byards related to this lawsuit, we will often use first names to identify the various individuals involved.

Plaintiff was employed by Byard Signal from the summer of 1992 until March 1996. The only work Plaintiff performed during 1992, 1993, and 1994 was consulting on Byard Signal's numerous bids for contracts. Such work was done sporadically, and occasionally weeks would pass where Plaintiff would do nothing at all for Byard Signal. Plaintiff received no pay from Byard Signal until the fall of 1995.[2] In 1996, Plaintiff left Byard Signal to work full-time for his father's business, Byard Electric.

Shortly after forming Byard Signal in the summer of 1992, the Byard brothers decided to purchase health insurance at group rates through the company. The Byards were familiar with Greater Atlantic because it was the company by which employees of their father's business were insured. Jeffrey contacted Greater Atlantic, obtained information on the available plans, presented the information to his brothers, and they agreed very quickly on Greater Atlantic's cheapest option, the Partnership Plan (the "Plan"). On August 26, 1993, Jeffrey signed a Group Master Contract with Greater Atlantic enrolling Byard Signal's employees in the Plan for one year effective September 1, 1993. The Plan was renewed for two subsequent annual terms.

Jeffrey Byard handled administrative tasks in connection with the Plan. He distributed the Greater Atlantic enrollment packages to employees. He prepared, circulated to employees and forwarded to Greater Atlantic the following paperwork: enrollment change forms, the Plan's small group profile documentation, employee W-4 forms, and terminations of coverage. When Plaintiff was dropped from the Plan in 1993, Jeffrey contacted Greater Atlantic to discuss his status and remitted the payment required to reinstate Plaintiff on the Plan. Jeffrey also forwarded documentation to Greater Atlantic for Plaintiff, in order for Plaintiff to receive prescription reimbursement benefits.

Jeffrey was also responsible for remitting the premium payments to Greater Atlantic. Jeffrey Byard described "[t]he arrangement for the purchase of insurance worked as follows: my employees would provide monthly cash payments, in the amount of Greater Atlantic HMO membership premiums. I would then remit the premium payments to Greater Atlantic." Aff. of Jeffrey Byard at ¶ 3. This statement clearly oversimplifies the premium payment process, however. The deposition testimony and documentary evidence reveals the following: Jeffrey Byard would collect cash from his brothers for their premium payments on a monthly basis, deposit the cash in Byard Signal's lone checking account, and then send a check drawn on that account to Greater Atlantic for the total amount due. The brothers would rarely pay Jeffrey the exact amount due, but some amount that was close. For example, he testified that "[i]f the guy's premium is $145 and he comes to give you $140, you know, that's sufficient" and "if the premiums were 156.65, they would give $160." 1/28/97 Dep. of Jeffrey Byard at 88, 153. Shortfalls in a given month for a particular employee would be made up with the surplus from that employee's past payments, surplus from other employees' contributions, or from the funds contributed by the brothers to cover Byard Signal's general expenses (e.g., telephone, postage, and other costs of preparing bids).[3]

According to Jeffrey Byard, his brothers' monthly cash payments exceeded the total amount due to Greater Atlantic each month "more times than not." *Id.* at 89, 153. This statement is difficult to verify because no effort was made to document employees' specific contributions towards their premium payments. Defendants were able to identify, however, only a single payment made by Byard Signal to Greater Atlantic that was made before adequate funds had been collected in advance. This payment, made in

---

**2.** Since Byard Signal's incorporation in June 1992, its only employees have been the Byard brothers and a family friend named Zachary Rollins, who was employed extremely briefly in 1992. Mr. Rollins never paid a premium and was never covered by the group policy. Jeffrey Byard testified that each of his brothers worked other jobs to make ends meet while employed by Byard Signal.

**3.** Byard Signal earned virtually no revenue until 1995, so any funds in the corporate checking account before then would have been contributed by the brothers themselves.

September 1993, was for $627.84, $47.84 more than the $580.00 that had been deposited earlier that month. Generally, the record indicates that if Jeffrey failed to collect sufficient funds from his brothers for a given month, either the delinquent brother was dropped from the Plan or Byard Signal simply paid nothing for the month. Any funds that had been contributed would then be used to cover other corporate expenses until sufficient cash had been collected to pay the premiums. In fact, Jeffrey Byard appears occasionally to have used the cash collected for premium payments on other corporate expenses even in months when all brothers made their payments. The check eventually sent to Greater Atlantic would be drawn on general corporate funds. Such practices caused Byard to be behind in its payments to Greater Atlantic "for quite some time." *Id.* at 165.

With these facts in mind, we begin our analysis.

## DISCUSSION

Plaintiff argues that we lack subject matter jurisdiction over this action because the Plan is not an ERISA employee welfare benefit plan and, even if it were, Plaintiff is not asserting state law claims that fall within ERISA's civil enforcement provisions. *See Dukes v. U.S. Healthcare, Inc.,* 57 F.3d 350, 354 (3d Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 564, 133 L.Ed.2d 489 (1995); 29 U.S.C. § 502(a)(1)(B). Because of our disposition of the former claim, we do not reach the latter.

Under the federal removal statute, a "civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States." 28 U.S.C. § 1441(a). Generally, under the well-pleaded complaint rule, removal is proper in federal question cases "only if a federal question is presented on the face of the plaintiff's properly pleaded complaint." *Dukes,* 57 F.3d at 353 (citing *Franchise Tax Bd. v. Construction Laborers Vacation Trust,* 463 U.S. 1, 9–12, 103 S.Ct. 2841, 2846–48, 77 L.Ed.2d 420 (1983)). There are some claims, however, that because "Congress may so completely

pre-empt a particular area ... any civil complaint raising this select group of claims is necessarily federal in character." *Dukes,* 57 F.3d at 354 (citing *Metropolitan Life Ins. Co. v. Taylor,* 481 U.S. 58, 63–64, 107 S.Ct. 1542, 1546–47, 95 L.Ed.2d 55 (1987)). A claim to recover benefits due under an ERISA "employee benefit plan" is one such claim. *Dukes,* 57 F.3d at 354; *Grimo v. Blue Cross/ Blue Shield, of Vermont,* 34 F.3d 148, 151 (2d Cir.1994).

ERISA defines an "employee welfare benefit plan" as:

> any plan, fund, or program which was heretofore established or is hereafter established or maintained by an employer ... to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, ... medical, surgical, or hospital care or benefits ...

29 U.S.C. § 1002(1). Pursuant to its authority under 29 U.S.C. § 1135, the Department of Labor has promulgated regulations designed to "clarify the definition of the terms 'employee welfare benefit plan' and 'welfare plan' ... by identifying certain practices which do not constitute employee welfare benefit plans." 29 C.F.R. § 2510.3–1(a)(1) (1993). Thus, 29 C.F.R. § 2510.3–1(j) provides:

> the terms 'employee welfare benefit plan' and 'welfare plan' shall not include a group or group-type insurance program offered by an insurer to employees or members of an employee organization, under which:
>
> (1) No contributions are made by an employer or employee organization;
>
> (2) Participation [in] the program is completely voluntary for employees or members;
>
> (3) The sole functions of the employer or employee organization with respect to the program are, without endorsing the program, to permit the insurer to publicize the program to employees or members, to collect premiums through payroll deductions or dues checkoffs and to remit them to the insurer; and

(4) The employer or employee organization receives no consideration in the form of cash or otherwise in connection with the program, other than reasonable compensation, excluding any profit, for administrative services actually rendered in connection with payroll deductions or dues checkoffs.

Group health insurance programs that satisfy each of these four criteria fall within a "safe harbor" of insurance programs excluded from ERISA coverage. *Grimo,* 34 F.3d at 152. Because a removing defendant bears the burden of proving the existence of federal jurisdiction, *see Dukes,* 57 F.3d at 359, Greater Atlantic has the burden of proving on this Motion to Remand that the insurance program at issue here fails to meet at least one of the criteria.[4]

■■■ We note at the outset that Greater Atlantic has clearly failed to satisfy its burden with respect to the second and fourth criteria. We find nothing in the record to contradict both Plaintiff's and Jeffrey's assertions in their respective affidavits that participation in the Plan was completely voluntary. *See* Aff. of Michael Byard at ¶ 7; Aff. of Jeffrey Byard at ¶ 3. Indeed, it appears that employees could discontinue their membership in the Plan simply by stopping their monthly payments to Jeffrey. As to the fourth criteria, Greater Atlantic suggests that Byard Signal received "consideration in the form of loan" when it used employee premium payments to cover the company's other expenses. Defendants cite no authority indicating that such a "loan" (in a non-interest bearing checking account) constitutes "consideration in the form of cash or otherwise" under the regulation, and we find that it is not compensation of the type contemplated by the regulation.

■■■ Greater Atlantic contends that the Plan fails to satisfy the first criteria because Byard Signal contributed to the premium payments of its employees. It relies on Jeffrey Byard's admission that, for example, $140 would be sufficient payment for a $145 premium and the $47.84 discrepancy in September 1993 between the cash deposited and the check issued by Byard Signal to Greater Atlantic for premiums that month. Plaintiff argues that this evidence is insufficient to carry Defendants' burden for several reasons. First, Jeffrey Byard testified that "more times than not" his brothers' payments exceeded the total amount due. The occasions when they did not constituted mere "errors in administration" and did not constitute a "program ... under which ... contributions are made by an employer." 29 C.F.R. § 2510.3–1(j). Second, September 1993 was the only month in which there was a shortfall. Relying on *Grimo v. Blue Cross/ Blue Shield, of Vermont,* 34 F.3d 148 (2d Cir.1994), Plaintiff argues that a single prior contribution does not defeat safe harbor status.

We disagree with Plaintiff that treating $140 cash as sufficient payment for a $145 premium was a mere "error in administration." Rather, it appears to have been Byard Signal's practice to accept payments rounded up or down to the nearest five or ten dollar increment. Nonetheless, Greater Atlantic has failed to point to evidence disproving Jeffrey Byard's claim that, on the whole, the brothers contributed more than was necessary, not less.[5] Further, we are convinced by the Second Circuit's rationale in *Grimo* that the single $47.84 discrepancy in September 1993 does not defeat safe harbor status. In *Grimo,* the employer had paid the entire

---

4. Our Court of Appeals has dealt with this safe harbor regulation just once, in a brief footnote of an opinion affirming the single decision of our Court to construe and apply the regulation. *See Shiffler v. Equitable Life Assur. Soc. of U.S.,* 663 F.Supp. 155, 160–61 (E.D.Pa.1986), *aff'd,* 838 F.2d 78, 82 n. 4 (3d Cir.1988). We have therefore turned for guidance to other federal courts, relying especially on recent decisions of the United States Courts of Appeals for the First, Second and Sixth Circuits.

5. It appears that any discrepancy in a given month for a particular employee would have been no greater than $5. Such a small, occasional shortfall, even if it were not made up for by prior and subsequent overpayments, would be *de minimis,* in the context of brothers in business together. *See Riggs v. Smith,* 953 F.Supp. 389 (S.D.Fla.1997) (finding employer's payment of membership fee to Chamber of Commerce, through which employees purchased insurance, "so indirect and *de minimis* as not to constitute a 'contribution' ").

premium for one of its principals in the first year its insurance plan was offered, and had contributed 50% of the premium for two of its principals "for a period of a year or two ending roughly a year before the [district court] hearing." *Id.* at 150. The district court found this evidence sufficient to defeat safe harbor status, but the Second Circuit disagreed. First, "the regulation's use of the present tense ('No contributions *are made*....') strongly suggests that past payments do not forever preclude application of the safe harbor provision." *Id.* at 153 (emphasis in original). Second, the court explicitly rejected the argument that a "contribution in any amount to any of its employees' costs of insurance at any time is enough to deprive an employer foreverafter of the safe harbor of the DOL regulations." *Id.* at 152. Such a "reading of the regulation is pointlessly unforgiving." *Id.* at 153. It would be similarly "pointlessly unforgiving" here to allow the single $47.84 shortfall in September 1993 to deprive the Plan of safe harbor status. We therefore conclude that Defendant has failed to carry its burden with respect to the first criteria.

As to the third criteria, Greater Atlantic argues that the "numerous administrative functions" performed by Jeffrey Byard in connection with the Plan defeat safe harbor status. Specifically, Greater Atlantic points to Jeffrey Byard's "record keeping, documentation of eligibility, notification of cancellation and reinstatement of benefits, as well as contacting Greater Atlantic regarding payment of prescription benefits, and to discuss eligibility information." Defs.' Mem. at 19. Plaintiff argues that the case law demonstrates that such tasks fall squarely within what is permitted by the regulation.

As noted *supra,* in order to fall within the safe harbor, the regulation requires that

> [t]he sole functions of the employer ... with respect to the program are, without endorsing the program, to permit the insurer to publicize the program to employees ..., to collect premiums through payroll deductions ... and to remit them to the insurer.

29 C.F.R. § 2510.3–1(j)(3). Considering only this language, Jeffrey Byard's administrative functions appear to go beyond the scope of this provision. However, courts have broadly construed this language in light of the policy underlying the regulation generally. The First Circuit explained this policy in *Johnson v. Watts Regulator Co.,* 63 F.3d 1129 (1st Cir.1995):

> [t]he safe harbor dredged by the regulation operates on the premise that the absence of employer involvement vitiates the necessity for ERISA safeguards. In theory, an employer can assist its work force by arranging for the provision of desirable coverage at attractive rates, but, by complying with the regulation, assure itself that, if it acts only as an honest broker and remains neutral vis-a-vis the plan's operation, it will not be put to the trouble and expense that meeting ERISA's requirements entails.

*Id.* at 1133; *see also id.* at 1134 ("the Department of Labor has called the employer neutrality that the third facet evokes 'the key to the rationale for not treating such a program as an employee benefit plan....'") (quoting 40 Fed. Reg. 34,526). Thus, the *Johnson* court held that

> an employer will be said to have endorsed a program ... if, in light of all the surrounding facts and circumstances, an objectively reasonable employee would conclude on the basis of the employer's actions that the employer had not merely facilitated the program's availability but had exercised control over it or made it appear to be part and parcel of the company's own benefit package.

*Id.* at 1135. Applying this standard, the First Circuit concluded that the district court had not clearly erred by finding safe harbor status where the employer, in addition to performing those payroll and publicizing tasks explicitly permitted by the regulation, undertook the following administrative duties:

> [the employer] issued certificates to enrolled employees confirming the commencement of coverage, maintained a list of insured persons for its own records, and assisted [the insurer] in securing appropriate documentation when claims eventuat-

ed.... [by] filling out the employer portion of the claim form, inserting statistical information maintained in [the employer's] personnel files ..., and keeping track of employee eligibility. [The employer] would follow up on a claim to determine its status, if [the insurer] requested that [the employer] do so, and would occasionally answer a broker's questions about a claim. *Id.* at 1136. The court agreed with the district court's holding partly because "[the employer] performed only administrative tasks, eschewing any role in the substantive aspects of program design and operation.... [and taking no part] in drafting the plan, working out its structural components, determining eligibility for coverage, interpreting policy language, investigating, allowing and disallowing claims, handling litigation or negotiating settlements." *Id.* The First Circuit reasoned further that these "administrative functions fit comfortably within the Secretary's regulation" because

> [a]ctivities such as issuing certificates of coverage and maintaining a list of enrollees are plainly ancillary to a permitted function (implementing payroll deductions). Activities such as answering brokers' questions similarly can be viewed as assisting the insurer in publicizing the plan. Other activities that arguably fall closer to the line, such as the tracking of eligibility status, are completely compatible with the regulation's aims [of employer neutrality].

*Id.* Finally, the court upheld the finding of no endorsement despite the employer's recommendation to its employees as "an attractive program." *Id.* at 1141.

The Sixth Circuit adopted the rationale and holding of *Johnson* in *Thompson v. American Home Assurance Company,* 95 F.3d 429 (6th Cir.1996). Finding that the "First Circuit's approach in *Johnson* is directly in keeping with Congress' intentions in enacting ERISA," the court agreed that

> where the employer 'offends the ideal of employer neutrality' as a result of its level of involvement, ERISA is properly in-

voked. 'Where, however, the employer separates itself from the program, making it reasonably clear that the program is a third party offering, not subject to the employer's control, then the safe harbor may be accessible.'

*Id.* at 436 (quoting *Johnson,* 63 F.3d at 1133 and 1137).[6] The court then held that "a finding of endorsement is appropriate if, upon examining all of the relevant circumstances, there is some factual showing on the record of substantial employer involvement in the creation or administration of the plan." *Thompson,* 95 F.3d at 429. The court went on to vacate the entry of summary judgment for the insurer on the grounds that material issues of fact existed where it was unclear whether the employer "acts as an administrator" or "participates in either devising the terms of the policy or in processing claims." *Id.* at 437.

Following the holdings and rationale of the First Circuit in *Johnson* and the Sixth Circuit in *Thompson,* we find that Greater Atlantic has not satisfied its burden of proving that Byard Signal has "offend[ed] the ideal of employer neutrality" in this case. It was undoubtedly clear to Byard Signal's employees that the Plan was a "third party offering, not subject to [Byard Signal's] control." *Johnson,* 63 F.3d at 1137; *Thompson,* 95 F.3d at 436. Indeed, the employees themselves selected the Partnership Plan from the range of options that Greater Atlantic made available. Further, Jeffrey Byard's administrative tasks would not lead "an objectively reasonable employee [to] conclude ... that [Byard Signal] had not merely facilitated the program's availability but ... made it appear to be part and parcel of the company's own benefit package." *Johnson,* 63 F.3d at 1135. Jeffrey Byard's administrative role was no more active than the employer in *Johnson,* and may have been less so. For example, whereas the *Johnson* employer appears to have regularly assisted in the claims process, Jeffrey Byard appears only to have done so on several occasions, helping to process prescription reimbursements for Plaintiff (and

---

**6.** In so holding, the Sixth Circuit implicitly rejected the Fifth Circuit's analysis in *Hansen v. Continental Ins. Co.,* 940 F.2d 971 (5th Cir.1991), which relied on the employer's intent in determining endorsement. The Sixth Circuit agreed with the First Circuit that the proper focus was on the point of view of the reasonable employee. *Id.* at 436; *Johnson,* 63 F.3d at 1137 n. 6.

possibly for their brother Kevin, as well).[7] Jeffrey's other administrative tasks constitute no more "substantial employer involvement in the ... administration of the plan", *Thompson,* 95 F.3d at 429, than the employer in *Johnson.*[8]

Defendant cites cases that are clearly distinguishable. In *Memorial Hospital System v. Northbrook Life Ins. Co.,* 904 F.2d 236 (5th Cir.1990); *Brundage–Peterson v. Compcare Health Services Ins. Co.,* 877 F.2d 509, 511 (7th Cir.1989); and *Fugarino v. Hartford Life and Accident Ins. Co.,* 969 F.2d 178 (6th Cir.1992), the employer paid a significant portion of some or all employees' premiums, thereby violating the first criteria. In *Shiffler v. Equitable Life Assur. Soc.,* 663 F.Supp. 155 (E.D.Pa.1986), *aff'd,* 838 F.2d 78 (3d Cir.1988), the plan was "presented to employees as a plan belonging to [the employer's] benefits package and specifically endorsed by [the employer]." 663 F.Supp. at 161; *see also* 838 F.2d at 82 n. 4. In *Hansen v. Continental Ins. Co.,* 940 F.2d 971 (5th Cir.1991), the court found that the employer had endorsed the plan where the employees received a booklet embossed with the employer's corporate logo which described the policy as the company's plan ("our plan"). *Id.* at 974; *see also Johnson,* 63 F.3d at 1129 ("In the difference between 'our plan' and 'a plan' lies the quintessential meaning of endorsement."). We therefore find that Defendant has failed to carry its burden with respect to the third criteria.

### CONCLUSION

We conclude that Defendant has failed to prove that the insurance plan at issue here is governed by ERISA, thus it is unnecessary to address whether the complaint asserts claims that fall within ERISA's civil enforcement provisions. Lacking subject matter jurisdiction over this action, we deny Defendant's outstanding Motion to Dismiss and remand the case to the Court of Common Pleas for Philadelphia County.

---

7. Such assistance resembles the "isolated, and apparently voluntarily undertaken, activity" found not to amount to "official employer involvement" in *du Mortier v. Massachusetts General Life Ins. Co.,* 805 F.Supp. 816 (C.D.Cal.1992). In *du Mortier,* the employer had actively tried to secure benefits from the insurer for an employee who spoke only Spanish. *Id.* at 821. The court held such activity insufficient to defeat safe harbor status because the "third requirement is aimed at ferreting out situations where the employer is taking some position or doing some things on behalf of or in coordination with the insurer or administrator." *Id.* In this case, Jeffrey Byard was clearly acting on behalf of and in coordination with his brothers, not Greater Atlantic. The same can be said of Jeffrey's assistance in having Plaintiff reinstated on the Plan.

8. The method of collecting premiums used here involves no more substantial employer involvement than the methods explicitly permitted by the regulation. In *Jones v. Pioneer Life Ins. Co.,* 858 F.Supp. 164 (M.D.Ala.1994), the employer and employee (who were uncle and nephew, respectively) had a similar cash reimbursement arrangement. The court found that the third criteria was not violated, concluding that "[t]o literally require a payroll deduction or dues checkoff even when the same thing is accomplished by the method used here would be an unjustified hyper-technical application of form over substance." *Id.* at 166. We agree.