**Betty MURDOCK, Plaintiff,**

v.

**UNUM PROVIDENT CORPORATION and Paul Revere Life Insurance Company, Defendants.**

**Civil No. 00–2443.**

United States District Court, W.D. Pennsylvania.

Dec. 6, 2002.

Stanley A. Winikoff, Jones, Gregg, Creehan & Gerace, Pittsburgh, PA, for Plaintiff.

William James Rogers, Thomson, Rhodes & Cowie, Pittsburgh, PA, for Defendants.

## MEMORANDUM ORDER

CINDRICH, District Judge.

Plaintiff was an executive at Allegheny General Hospital ("AGH"). In connection with AGH's Executive Flex benefit plan, plaintiff purchased a disability insurance policy from defendants. Ms. Murdock applied for benefits under the policy in 1999 and defendants denied her claim. This

litigation, in which plaintiff sued under state law for breach of contract and bad faith denial of coverage pursuant to 42 Pa.C.S.A. § 8371, followed.

Pending is defendants' Motion for Summary Judgment (Doc. No. 17). Defendants argue that plaintiff's state law claims are preempted because the policy of disability insurance at issue was an employee benefit plan under the Employee's Retirement Income Security Act of 1974 ("ERISA"). Plaintiff admits the existence of an ERISA plan but contends that ERISA's safe harbor provisions apply (*see* 29 CFR § 2510.3–1(j)) ("Safe Harbor"), such that the policy at issue should be governed by the standards applicable to insurance policies.[1]

The applicable law was outlined in *Schneider v. UNUM Life Ins. Co. of America*, 149 F.Supp.2d 169 (E.D.Pa. 2001):

> The Safe Harbor Provision provides, in pertinent part, that a plan will not be considered an "employee welfare benefit plan" under ERISA if it includes a[G]roup or group-type insurance program offered by an insurer to employees or members of an employee organization, under which (1) No contributions are made [to the plan] by an employer or employee organization; (2) Participation [in] the program is completely voluntary for employees or members; (3) The sole functions of the employer or employee organization with respect to the program are, without endorsing the program, to permit the insurer to publicize the program to employees or members, to collect premiums through payroll deductions or dues checkoffs and to remit them to the insurer; and (4) The employer or employee organization receives no consideration in the form of cash or otherwise in connection with the program, other than reasonable compensation, excluding any profit, for administrative services actually rendered in connection with payroll deductions or dues checkoffs. 29 C.F.R. § 2510.3–1(j).

The Safe Harbor Provision only applies to programs that satisfy all four of the above criteria, *see Zimnoch v. ITT Hartford*, 2000 WL 283845 at *5 (E.D.Pa. Mar. 14, 2000).

The third factor, regarding the question of whether the employer has "endorsed" the program, has proven to be the most troublesome for the courts. The Court of Appeals for the Third Circuit has not ruled definitively on the issue. Our review of non-precedential case law from other district courts and other circuits discloses contradictory conclusions regarding similar degrees of employer involvement (*see infra* at pp. 7–8). Having reviewed the facts and holdings of many of these cases, we were left with no clear path to a principled decision on the question of what is meant by employer endorsement of a program. While the test is clear, and numerous cases have discussed its mechanical application to a variety of fact patterns, there has been little discussion of the principles and considerations underlying the Safe Harbor provision. Accordingly, we take this occasion to review the broad purposes of ERISA and to attempt to fashion a rule which will respect and further those purposes.

It is clear from the Congressional findings and declaration of policy set forth in 29 U.S.C. § 1001 that ERISA was intended to protect employees. Part of Con-

---

1. We note the split of authority in the United States District Court for the Eastern District of Pennsylvania as to whether bad faith claims under Pennsylvania law are preempted by ERISA. For purposes of this motion, we will assume, along with the majority of courts, that ERISA preempts such claims if the Safe Harbor does not apply.

gress' effort to protect employees was the creation of an effective forum for resolving benefits disputes. In Section 1001(b), Congress declared its policy to protect interstate commerce and participants in employee benefit plans "by requiring the disclosure and reporting to participants and beneficiaries of financial and other information with respect thereto, by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, **and ready access to the Federal courts.**" (Emphasis added.) In *Herzberger v. Standard Ins. Co.*, 205 F.3d 327, 330 (7th Cir.2000), the Court described ERISA plans as "a special kind of contract, in order to confer greater protection on one of the parties, namely the participant or beneficiary, than on the other, the plan administrator . . . and obviously this particular weighting favors, in doubtful cases, a presumption of full judicial review at the behest of the favored party."

The most thorough explanation of the underlying goals of the Safe Harbor occurred in *Johnson v. Watts Regulator Co.*, 63 F.3d 1129 (1st Cir.1995). The Court instructed that the Safe Harbor at issue "operates on the premise that the absence of employer involvement vitiates the necessity for ERISA safeguards." *Id.* at 1133. The Court also relied on the Department of Labor's description of "employer neutrality" as the key factor in determining whether a program will be deemed an employee benefit plan under ERISA. *Id.* at 1134 (citing 40 Fed.Reg. 34,526).[2] In other words, ERISA is intended to govern the employer-employee relationship, but does not extend to agreements entered into by employees with third-parties. The Court cautioned that "remaining neutral does not require an employer to build a moat around a program or to separate itself from all aspects of program administration." *Id.* The Court concluded that ERISA's objectives were best met by adopting a "reasonable employee" standard for judging whether the Safe Harbor had been met.[3]

It is interesting that the ERISA Safe Harbor is not being advocated by the employee in this case (or in any of the other cases reviewed by this court.) Nor is the employer seeking a Safe Harbor—the employer is not even a party to this matter. Rather, it is a third-party insurer who seeks to use ERISA as a shield to liability. By having the plan at issue construed as

**2.** The Department of Labor issued another Interpretive Bulletin on June 18, 1999, explaining its "long-held view" that an employer who simply provides employees with the opportunity to participate, "under terms and conditions similar to those of certain other optional payroll deduction programs, such as for automatic savings deposits or purchases of United States savings bonds," does not create a "pension plan" within the meaning of ERISA. 64 Fed.Reg. 33002.

**3.** While we agree with the *Johnson* court's goals, we have doubts about the wisdom of making "employer endorsement" into a fact-intensive, reasonableness test. Such a test spawns additional litigation and introduces the potential of inconsistent results (i.e., a jury could conclude that the policy at issue is within the Safe Harbor for Employee A's lawsuit, while another jury reached the opposite conclusion in Employee B's suit). More importantly, this test creates uncertainty for employers when designing their plans. Therefore, we believe that there should be a clear, bright-line test for evaluating "employer endorsement," as exists for the other Safe Harbor factors. We propose that a plan be deemed "endorsed" (and therefore outside the Safe Harbor) only if there is a clear, conspicuous statement from the employer to the employees, such as: "**This policy is an employee benefit and will be governed by ERISA.**" Presumably, insurers will want employers to include this endorsement and employers, in turn, will gain some leverage in these negotiations.

an ERISA plan, the insurer will be able to invoke the preemption doctrine, with numerous favorable consequences for the insurer.

The broad preemption doctrine has been described as an integral part of ERISA's "interlocking, interrelated, and interdependent remedial scheme." *Massachusetts Mut. Life Ins. Co. v. Russell,* 473 U.S. 134, 146, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985). If the insurer succeeds in characterizing this policy as an ERISA plan, the employee may lose the right to trial by jury, the right to file suit in state court, perhaps the right to sue for bad faith denial of coverage and recover punitive damages, and the right to file suit without exhausting administrative remedies. *Johnson,* 63 F.3d at 1130–31. Perhaps most importantly, the employee loses the right to have the policy language construed under the principles of contract law (and to have ambiguities construed against the drafter). Instead, if the plan documents confer appropriate discretion under ERISA, the insurer's interpretation of its own policy can only be overturned if it was "arbitrary and capricious." *See Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). In *Pegram v. Herdrich,* 530 U.S. 211, 232 n. 15, 120 S.Ct. 2143, 147 L.Ed.2d 164 (2000), the Supreme Court commented that it was "at least questionable" whether Congress intended to include entities whose eligibility decisions would affect their own bottom lines within the parties entitled to such unfettered discretion.

■ The arbitrary and capricious standard presents a difficult obstacle for an employee challenging a benefits decision to overcome. Because of the dramatic consequences of this standard of review, it should be part of the "reasonable employ-

ee" analysis. In addition to asking whether a reasonable employee would have thought that his employer "endorsed" the policy, we should also ask whether a reasonable employee would have expected that the insurer would have discretion to make coverage decisions regarding the policy at issue subject only to "arbitrary and capricious" review. Of course, this issue would not arise under our proposed bright-line test. With this background, we now turn to application of the Safe Harbor test.

### 1. Employer Contributions

The first factor of the Safe Harbor test evaluates whether the employer has made contributions to the Plan. In this case, plaintiff contends that she paid for the disability policy at issue by using her pretax, flex dollars. Article 3.1 of the Allegheny Health, Education and Research ("AHERF") Flexible Individual Long–Term Disability Benefit [4] states that "the Company shall pay the premium on the Policy each Premium Year." However, Article 3.2 provides that a Participant may elect to reimburse the Company for all or a portion of the premium from after-tax income. Because plaintiff elected to do so, we conclude that there was no employer contribution. Therefore, the first factor is met.

### 2. Voluntariness

The second factor of the Safe Harbor test evaluates whether the employee's participation was voluntary. In this case, Murdock was not required to purchase the enhanced disability insurance at issue. Instead, she could choose among a variety of benefits options from AHERF's cafeteria

---

**4.** (Exhibit D to Attachment 1 of the Plan, which was produced as Exh. B to Defendants'

Motion for Summary Judgment)

plan. Therefore, this factor was satisfied. *Zimnoch,* 2000 WL at 283845 *3. Defendants argue that only certain employees were eligible to participate in the Execu–Flex plan. However, this fact goes more to the issue of "employer endorsement" than voluntariness.

### 3. Employer Endorsement/Participation

This factor is the key issue in the case. It is also the most difficult to resolve on summary judgment because it incorporates a "reasonable employee" standard, as we discussed *supra.* In *Johnson,* 63 F.3d at 1135, the Court explained that the third Safe Harbor factor would be violated if: "[i]n light of all the surrounding facts and circumstances, an objectively reasonable employee would conclude on the basis of the employer's actions that the employer had not merely facilitated the program's availability but had exercised control over it or made it appear to be part and parcel of the company's own benefit package." The Court elaborated by saying that, as long as the employer merely advises employees of the availability of group insurance, accepts payroll deductions, passes them on to the insurer, and performs other ministerial tasks that assist the insurer in publicizing the program, it will not be deemed to have endorsed the program under section 2510.3–1(j)(3). *Id.* at 1134. The question of endorsement under the Safe Harbor Provision is a mixed question of law and fact. *Id.*

█ The principle animating factor 3 of the Safe Harbor Provision is one of employer neutrality; plans are not subject to ERISA in cases where employers are disconnected from the program such that it is clear that the program represents a "third party's offering" to employees. *Thompson v. American Home Assurance Co.,* 95 F.3d 429, 436 (6th Cir.1996). The First Circuit explained this policy in *Johnson,* 63 F.3d at 1133:

> [t]he safe harbor dredged by the regulation operates on the premise that the absence of employer involvement vitiates the necessity for ERISA safeguards. In theory, an employer can assist its work force by arranging for the provision of desirable coverage at attractive rates, but, by complying with the regulation, assure itself that, if it acts only as an honest broker and remains neutral vis-a-vis the plan's operation, it will not be put to the trouble and expense that meeting ERISA's requirements entails.

In this case, the enhanced disability policy at issue was offered as one of several choices in AHERF's cafeteria-style Execu–Flex benefit plan. This disability policy provided enhanced coverage because it used an "own occupation" test for disability rather than the "reasonable occupation" test used under the group policies offered as part of AHERF's Basic Benefits. Allegheny General Hospital Employee Benefit Summary at 6 (Exh. C to Defendant's Motion).

Article 1.1 of the Execu–Flex plan states that long-term disability benefits elected by the Participant "shall be governed by the terms of this Exhibit D, in addition to the other terms of the Flexible Benefit Plan and Execu–Flex Benefit Plan." Article 1.2.1 defines the "Insurer" as "the insurance company selected by the Company, in its sole discretion. . . ." AHERF also determined the eligibility of employees who could participate in the Execu–Flex program. Article 2.1 states that "The Company shall assist the Participant in applying for issuance of a Policy providing a level of coverage and such other provisions as determined by the Company." AHERF also assisted plaintiff in appealing her claim, although it had no authority to determine whether she

was entitled to benefits. AHERF appointed one of its employees to be the Execu–Flex plan administrator. These facts all tend to indicate that the Safe Harbor was breached.

There is contrary evidence, as well. Although Paul Revere was the only company selected to provide enhanced long-term disability insurance as an optional selection, AHERF also provided several options for short and long-term disability insurance as part of its Basic Benefits. Employees had the option to accept or reject the enhanced disability coverage and participants could vary the amounts of coverage. The plan summary explained that an application and medical examination may be required and that the underwriting decision would be made by Paul Revere.

The most analogous cases have come to different conclusions. In *Butero v. Royal Maccabees Life Ins. Co.*, 174 F.3d 1207 (11th Cir.1999), the Court found that an employer had endorsed a third-party plan under the meaning of the Safe Harbor Provision because "it picked the insurer; it decided on key terms, such as portability and the amount of coverage; it deemed certain employees ineligible to participate; it incorporated the policy terms into the self-described summary plan description for its cafeteria plan; and it retained the power to alter compensation reduction for tax purposes." *Id.* at 1213–14; *see also Cecchanecchio v. Continental Cas. Co.*, 2001 WL 43783, at *3 (E.D.Pa. Jan. 19, 2001) (finding that endorsement existed where an employer served as "the point of contact as the plan administrator, and, more importantly, handle[d] the filing of complaints"). In *Hrabe v. Paul Revere Life Ins. Co.*, 951 F.Supp. 997 (M.D.Ala. 1996), the court found an employer endorsement because the employer selected the policy as the only disability policy for inclusion in its flexible benefit plan, which

was funded by tax-free dollars and administered by the employer. In *Hansen v. Continental Ins. Co.*, 940 F.2d 971 (5th Cir.1991), the Court held that an employer had endorsed a plan because the company retained a full-time benefits administrator who submitted claims on behalf of employees and had sent out a brochure to employees describing the insurance as "our" plan and as "a valuable supplement to your existing coverage." *Id.* at 974. In *Shiffler v. Equitable Life Assurance Society*, 663 F.Supp. 155 (E.D.Pa.1986), *aff'd* 838 F.2d 78 (3d Cir.1988), the court found employer endorsement where it presented the plan to employees as belonging to its benefit package. *Accord Schneider*, 149 F.Supp.2d at 169 (granting summary judgment because the employer-union permitted an "endorsed" logo to be placed on the plan and referred to it as part of its employee benefits package).

On the other hand, in *Byard v. QualMed Plans for Health, Inc.*, 966 F.Supp. 354 (E.D.Pa.1997), the court found that the defendant had not satisfied its burden of proving that Byard Signal had "offend[ed] the ideal of employer neutrality." The court found that it was clear to Byard Signal's employees that the Plan was a "third party offering, not subject to [Byard Signal's] control" because the employees themselves selected the Partnership Plan from the range of options that Greater Atlantic made available. Similarly, in *Johnson*, 63 F.3d at 1136, the Court held that the employer had not breached the Safe Harbor test where it had no hand in drafting the plan, working out its structural components, determining eligibility for coverage, interpreting policy language, investigating claims or negotiating settlements. *Accord Levett v. American Heritage Life Ins. Co.*, 971 F.Supp. 1399 (M.D.Ala.1997); *Zavora v. Paul Revere Life Insurance Co.*, 145 F.3d 1118 (9th Cir.1998). In *Lott v. Metropolitan Life*

*Ins. Co.,* 849 F.Supp. 1451 (M.D.Ala.1993), the court found that an employer had not endorsed a life insurance program offered separately from the employer's cafeteria benefit plan.[5]

For purposes of this summary judgment motion, we must construe all facts in the light most favorable to plaintiff. Although the majority of the cases seem to indicate that an employer's choice of a disability plan to be part of its cafeteria menu breaches the Safe Harbor, we cannot say as a matter of law that the circumstances of this case must lead a reasonable employee to conclude that AHERF endorsed the plan. Although the Execu–Flex Benefit Plan itself was clearly endorsed by AHERF, defendants have produced no evidence to indicate that AHERF endorsed the enhanced disability policy at issue, particularly when another disability insurance option was issued as part of AHERF's Basic Benefits. Accordingly, we cannot conclude as a matter of law that AHERF violated this element of the Safe Harbor test.[6] *Accord Rubin v. Guardian Life Ins. Co. of Am.,* 174 F.Supp.2d 1111 (D.Or. 2001) (denying insurer's motion for summary judgment because there was a question of fact regarding employer endorsement).

### 4. Employer Consideration

The fourth element of the Safe Harbor test considers whether the employer received an economic benefit other than reasonable compensation for performing the payroll deduction. Defendant's motion does not present any evidence that AHERF received such consideration.

In summary, there is little or no dispute that AHERF complied with factors (1), (2) and (4) of the Safe Harbor test. As to element (3), we cannot conclude as a matter of law, under either the "reasonable employee" standard or our proposed bright-line test, that AHERF endorsed the policy. We believe that this result, which preserves plaintiff's right to challenge defendants' denial of her claim for benefits, is in accord with the principles and policies of ERISA.

Accordingly, this 6th day of December, 2002, defendant's Motion for Summary Judgment (Doc. No. 17) is hereby **DENIED.**

---

5. The cited cases are not exhaustive, but they do give a representative flavoring of the ways in which the Safe Harbor test has been employed.

6. We would reach the same result under our newly proposed bright-line test, because there was no clear statement from AHERF that the policy at issue was an employee benefit that would be governed by ERISA.