Julius SCHNEIDER, JR., and Eileen F. Schneider, Plaintiffs,

v.

UNUM LIFE INSURANCE COMPANY OF AMERICA, Defendant.

No. 00–CV–1838.

United States District Court, E.D. Pennsylvania.

May 17, 2001.

Wallace B. Eldridge, III, Allentown, PA, for Plaintiff.

E. Thomas Henefer, Stevens and Lee, Reading, PA, for Defendant.

### *OPINION AND ORDER*

VAN ANTWERPEN, District Judge.

### I. INTRODUCTION

The question before this Court is whether defendant UNUM Life Insurance Company of America ("UNUM") is entitled to summary judgment against plaintiffs Mr. and Mrs. Julius Schneider's ("Plaintiffs") claims for relief pursuant to a long-term care insurance agreement ("LTC policy" or "LTC plan") entered into by Plaintiffs with UNUM in February 1995. Plaintiffs present four Counts in their Complaint. Count I cites violations of three separate provisions of the Pennsylvania insurance code, 40 Pa.Stat. §§ 991.1105(b)(1), (c), 991.1107, and 991.1111(a), (d), and (e), as well as of two regulations promulgated by the Pennsylvania Insurance Commissioner, 31 Pa.Code §§ 89.94, 89.908(d). Counts II through IV present two common law contract claims and one claim under Pennsyl-

vania's Consumer Protection Law, 73 Pa. Stat. § 201.1 et seq. UNUM argues that its LTC plan is governed by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001–1461, and therefore that Plaintiffs' state law claims are precluded by ERISA's Preemption Clause, 29 U.S.C. § 1144(a). Plaintiffs offer no federal law issues for review. More specifically, they do not present any claims under ERISA's civil enforcement provisions, 29 U.S.C. §§ 1132(a)(1)(B)-(a)(3), against UNUM.

Plaintiffs filed their Complaint on April 7, 2000, in response to which UNUM filed Defendant's Answer and Affirmative Defenses on May 19 of that year. UNUM filed its Defendant's Motion for Summary Judgment on February 23, 2001, which was accompanied that same day by a Memorandum of Law in Support of Defendant's Motion for Summary Judgment. Plaintiffs responded with Plaintif's [sic] Answer Opposing Defendant's Motion for Summary Judgment on March 20, 2001. We have considered all of the above filings, as well as the extensive exhibits and appendices included therewith, and have applied the commonly accepted standard of review for summary judgment motions as explained by the Supreme Court of the United States. We find that UNUM's LTC plan does come under ERISA, and therefore that Plaintiffs' state law contract and consumer protection claims are preempted. As a result, UNUM is entitled to summary judgment on these claims. We also find, however, that Plaintiff's claims pursuant to Pennsylvania insurance law are excepted from preemption by ERISA's Savings Clause, 29 U.S.C. § 1144(b)(2)(A), and for this reason, among others, deny UNUM's motion for summary judgment with respect to those claims.

## II. BACKGROUND

UNUM offered its long-term care insurance policy ("LTC policy") to members of the Pennsylvania State Education Association ("PSEA") on an open enrollment basis as of January 26, 1995. Open enrollment means that offerees may obtain coverage without providing their prospective insurer with any information regarding their medical history. Mr. Julius Schneider, Jr. was a member of PSEA and took advantage of UNUM's open enrollment offer. Mr. Schneider has multiple sclerosis ("MS"), and as a result allegedly telephoned a representative of UNUM on two separate occasions to confirm that his MS would not preclude him from coverage under the LTC policy. Mr. Schneider claims he was assured by UNUM that his condition would not preclude coverage. Mr. Schneider purchased UNUM's LTC policy and received a certificate of insurance effective February 1, 1995. Mr. Schneider made timely payments to UNUM for approximately three years until his MS rendered him completely disabled and in need of benefits in January 1998. UNUM denied Mr. Schneider's claim, however, on the grounds that his policy never took effect. UNUM argues that Mr. Schneider was never entitled to benefits under the LTC policy because, at the time of his enrollment, he was "totally disabled" in violation of one of the policy's exclusions.

## III. DISCUSSION

We find that UNUM's Motion for Summary Judgment against Plaintiffs is properly before this court, that ERISA and Pennsylvania insurance law control the outcome of the case, and that UNUM is entitled to summary judgment on some, but not all, of Plaintiffs' claims. These findings and rulings are explained below.

### A. Jurisdiction

This matter is properly before this court on diversity grounds. Plaintiffs reside at

1419 Grace Street, Allentown, Pennsylvania, 18103, and UNUM is a company having its principal place of business at 2211 Congress Street, Portland, Maine, 04122. (*See* Pls' Compl. at ¶¶ 1–3; Def.'s Answer and Affirmative Defenses at 1.) Plaintiffs' claims are in excess of seventy-five thousand ($75,000) dollars. Jurisdiction is therefore proper under 28 U.S.C. § 1332(a)(1) and (c)(1). Plaintiff makes no claims of federal question jurisdiction.

### B. Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). An issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable jury could find for the nonmoving party, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and a factual dispute is "material" only if it might affect the outcome of the suit under existing law. *Id.* at 248, 106 S.Ct. 2505. Although all inferences must be drawn and all doubts resolved in favor of the nonmoving party, *see United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Wicker v. Consol. Rail Corp.*, 142 F.3d 690, 696 (3d Cir.1998), "[t]he moving party is 'entitled to a judgment as a matter of law' [if] the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Anderson*, 477 U.S. at 248–49, 106 S.Ct. 2505 (explaining that the nonmoving party bears the burden of demonstrating the existence of evidence that would support a jury finding in its favor).

UNUM contends that its LTC policy is governed by ERISA. Although they do not maintain that the policy falls outside ERISA's definition of a "welfare benefit plan," 29 U.S.C. § 1002(1), Plaintiffs respond by citing two grounds upon which their state law claims would not be subject to ERISA. They first claim that the LTC policy is not included in ERISA's definition of a "welfare benefit plan" because it is excepted from such consideration by means of the Department of Labor's Safe Harbor Provision, 29 C.F.R. § 2510.3–1(a)(1). Alternatively, Plaintiffs claim that ERISA's Savings Clause, 29 U.S.C. § 1144(b)(2)(A), excepts the LTC policy from ERISA standards because the policy "regulates insurance." We find that the Safe Harbor Provision does not apply to UNUM's LTC plan, but that the Savings Clause excepts Plaintiffs' claims under Pennsylvania insurance laws from ERISA.

### C. ERISA's Application to Plaintiffs' Claims

Plaintiffs do not dispute UNUM's initial claim that the LTC policy purchased by Mr. Schneider fits under ERISA's definition of a "welfare benefit plan." "The existence of an ERISA plan is a question of fact, to be answered in the light of all the surrounding circumstances from the point of view of a reasonable person." *Zimnoch v. ITT Hartford*, 2000 WL 283845, at *3 (E.D.Pa. Mar.14, 2000) (citing *Zavora v. Paul Revere Life Ins. Co.*, 145 F.3d 1118, 1120 (9th Cir.1998)). According to ERISA, a welfare benefit plan is

> Any plan, fund or program which was ... established or maintained by an employer *or by an employee organization,* or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries,

through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment. . . .

29 U.S.C. § 1002(1) (emphasis added). A plan exists when, "from the surrounding circumstances, a reasonable person could ascertain the intended benefits, a class of beneficiaries, the source of financing and procedures for receiving benefits." *Smith v. Hartford Ins. Group*, 6 F.3d 131 (3d Cir.1993). UNUM cites evidence acceptable under Fed.R.Civ.P. 56 for consideration in summary judgment cases as well as applicable case law in support of PSEA's status as an "employee organization" under ERISA. (*See* Def.'s Mot. Summ. J. at 7–8.) More specifically, UNUM correctly argues that PSEA is an employee organization by virtue of its status as a labor union. *See* 29 U.S.C. § 1002(4). UNUM also establishes, again through evidence appropriate for consideration in conjunction with a summary judgment motion, that the LTC policy satisfies each of the *Smith* standards for determining if a plan is a "welfare benefit plan" under ERISA. (*See* Def.'s Mot. Summ. J. at 8.) Moreover, in light of Plaintiffs' failure to contest any of UNUM's assertions regarding the meaning or literal applicability of § 1002(1), we find that no genuine issue of material fact exists with respect to whether the Plaintiff's LTC policy is a "plan" under that section. The remaining question, then, is whether the program is one "established or maintained by the employer." In order to answer this question, we must determine whether the plan comes within the Department of Labor's Safe Harbor Provision, 29 C.F.R. § 2510.3–1(j). *See Zimnoch v. ITT Hartford*, 2000 WL 283845, at *3 (E.D.Pa. Mar.14, 2000). A plan that satisfies the Safe Harbor Provision's standards will be deemed not to have been "established or maintained by the employer," and therefore will not be governed by ERISA. We now turn to this question, and find that PDEA's plan does not satisfy the four criteria necessary to place it within the Safe Harbor Provision.

1. The Safe Harbor Provision

■ The Safe Harbor Provision provides, in pertinent part, that a plan will not be considered an "employee welfare benefit plan" under ERISA if it includes a

[G]roup or group-type insurance program offered by an insurer to employees or members of an employee organization, under which

(1) No contributions are made [to the plan] by an employer or employee organization;

(2) Participation [in] the program is completely voluntary for employees or members;

(3) The sole functions of the employer or employee organization with respect to the program are, without *endorsing* the program, to permit the insurer to publicize the program to employees or members, to collect premiums through payroll deductions or dues checkoffs and to remit them to the insurer; and

(4) The employer or employee organization receives no consideration in the form of cash or otherwise in connection with the program, other than reasonable compensation, excluding any profit, for administrative services actually rendered in connection with payroll deductions or dues checkoffs.

29 C.F.R. § 2510.3–1(j) (emphasis supplied). Although case law makes it clear that the Safe Harbor Provision only excludes programs that satisfy all four of the above criteria, *see Zimnoch v. ITT Hartford*, 2000 WL 283845, at *5 (E.D.Pa. Mar.14, 2000), UNUM presents no evi-

dence that the PSEA plan violates factors (1), (2), or (4). UNUM instead claims that PSEA "endorsed" UNUM's LTC policy in violation of factor (3), and therefore that the Safe Harbor Provision does not apply. (*See* Def's Mot. Summ. J. at 9.) We agree. PSEA endorsed UNUM's LTC plan within the meaning of the Safe Harbor Provision. Plaintiffs' claims are therefore preempted under ERISA, provided no other preemption exception applies.

■■■ The principle animating part (3) of the Safe Harbor Provision is one of employer neutrality; plans are not subject to ERISA in cases where employers are disconnected from the program such that it is clear that the program represents a "third party's offering" to employees. *Thompson v. American Home Assurance Co.*, 95 F.3d 429, 436 (6th Cir.1996). This principle was more clearly defined in *Johnson v. Watts Regulator Co.*, 63 F.3d 1129 (1st Cir.1995), in which the First Circuit explained that

> [A]n employer will be said to have endorsed a program within the purview of the ... safe harbor regulation if, in light of all the surrounding facts and circumstances, an objectively reasonable employee would conclude on the basis of the employer's actions that the employer had not merely facilitated the program's availability but had exercised control over it or made it appear to be part and parcel of the company's own benefit package.

*Id.* at 1135. The court elaborated by saying that,

> as long as the employer merely advises employees of the availability of group insurance, accepts payroll deductions, passes them on to the insurer, and performs other ministerial tasks that assist the insurer in publicizing the program, it will not be deemed to have endorsed the program under section 2510.3–1(j)(3).

*Id.* at 1134. Finally, the *Johnson* court explained that the question of endorsement under the Safe Harbor Provision is a mixed question of law and fact.

> In some cases the evidence will point unerringly in one direction so that a rational factfinder can reach but one conclusion. In those cases, endorsement becomes a matter of law. In other cases, the legal significance of the facts is less certain, and the outcome will depend on the inferences that the factfinder chooses to draw. In those cases, endorsement becomes a question of fact.

*Id.* at 1135 n. 3. The *Johnson* standard for determining endorsement has been adopted in subsequent decisions of other courts addressing similar issues. *See, e.g., Thompson*, 95 F.3d at 436 (citing the *Johnson* standard in evaluating the applicability of part (3) of the Safe Harbor Provision); *Byard v. QualMed Plans for Health, Inc.* 966 F.Supp. 354, 359–60 (E.D.Pa.1997) (same). In light of the Third Circuit's having yet to address this question, we likewise adopt the First Circuit's test in our analysis of whether PSEA endorsed the LTC policy within the meaning of ERISA's Safe Harbor Provision.

The parties' accounts of the important facts are not inconsistent with one another. We therefore find that no genuine issue of material fact exists with regard to this matter. Plaintiffs cite evidence properly before this court with regard to a motion for summary judgment in order to point out that PSEA had no role in either drafting or administering UNUM's LTC plan. UNUM collected all the premiums and supervised the marketing of the program to PSEA members. "UNUM is solely responsible for claims administration ... and has the sole and exclusive right to decide benefit eligibility. PSEA does not participate in those determinations." (Pls' Answer Opposing Def's Mot.

Summ. J. at 11.) Furthermore, UNUM paid all marketing expenses and had all questions regarding the plan directed to a representative of UNUM, not PSEA. Plaintiffs admit that UNUM requested permission to use PSEA's logo on documents pertaining to the program, and that UNUM in turn required KeyCare to include that logo on all such documents. They also admit that PSEA drafted a form letter "for use by UNUM and KeyCare in advising the membership of the policy's availability." (*Id.* at 12.) Plaintiffs present evidence that Mr. Schneider was unaware of any connection between PSEA and UNUM, that he never dealt with anyone at PSEA regarding the program, and that none of the documents submitted to him as part of his involvement with the LTC policy mentioned ERISA's applicability. (*See id.* at 13.) Plaintiffs conclude by noting that they chose the LTC program from a list of options presented by PSEA.

UNUM also relies on sources admissible under Fed.R.Civ.P. 56(c) to focus on the role PSEA played in the LTC program. UNUM offers evidence that "PSEA presented the Plan as part of its benefit package in numerous documents including descriptive materials outlining the 'PSEA Group Long Term Care Plan.'" (Def's Mot. Summ. J. at 10.) UNUM admits to distributing descriptive materials about the LTC plan with the PSEA logo on them to PSEA members. UNUM also shows that PSEA negotiated with UNUM for PSEA's endorsement of the program. UNUM then refers to additional documents involving the LTC plan that connect that program to PSEA. It discusses how PSEA outlined reasons for its members to join the program and encouraged local union presidents to make members aware of the opportunities the program provided. Finally, UNUM points out two examples of what it considers explicit endorsement of the LTC program by PSEA. First, it

notes that the PSEA logo included on informational and other documents relating to the program included the phrase "PSEA Endorsed Special Services." Second, UNUM recounts the deposition of Plaintiff Julius Schneider, Jr., in which Mr. Schneider explained that the program was offered to him "as a member of PSEA who was endorsing your company." (App. Supp. Def's Mot. Summ. J. Exh. A at 349.)

Because we find that no genuine issue of material fact exists with respect to whether PSEA endorsed the LTC program, we move on to determine whether UNUM is entitled to judgment as a matter of law. In deciding whether the movant is entitled to such a judgment, we draw all inferences and resolve all doubts in favor of the non-moving party. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Wicker v. Consol. Rail Corp.,* 142 F.3d 690, 696 (3d Cir.1998). In this case, we find that UNUM is entitled to judgment as a matter of law, as the undisputed facts, when viewed in light of the relevant precedent, clearly indicate that PSEA endorsed the LTC program in violation of part (3) of the Safe Harbor Provision.

In *Johnson,* the First Circuit addressed the question of endorsement and found that the plaintiff's employer had not endorsed a third-party insurance plan within the meaning of the Safe Harbor Provision. The court cited a number of factors that it considered important in arriving at this decision. First, although the employer "distributed the sales brochure, waiver-of-insurance cards, and enrollment cards, those efforts were undertaken to help [the third-party insurer] publicize the program; the documents themselves were prepared and printed by [the third party insurer], and delivered by it to [the employer] for distribution." *Johnson,* 63 F.3d at 1136. Next, although the employer submitted a

cover letter on company letterhead and signed by one of its vice-presidents which [the third-party insurer] typeset and incorporated into the cover page of its sales brochure, the letter "nowhere suggested that [the employer] ha[d] any control over, or proprietary interest in, the group insurance program." *Id.* Neither the letter nor the brochure mentioned ERISA. *See id.* The *Johnson* court also found it significant that the employer "had no hand in drafting the plan, working out its structural components, determining eligibility for coverage, interpreting policy language, investigating, allowing and disallowing claims, handling litigation, or negotiating settlements." *Id.* The court concluded that the employer "performed only administrative tasks," such as "collect[ing] premiums through payroll deductions, remitt[ing] the premiums to [the third-party insurer], issu[ing] certificates to enrolled employees confirming the commencement of coverage, maintain[ing] a list of insured persons for its own records, and assist[ing] [the third-party insurer] in securing appropriate documentation when claims eventuated." *Id.*

Finally, the *Johnson* court made its ultimate decision by distinguishing the case before it from *Hansen v. Continental Insurance Company,* 940 F.2d 971 (5th Cir. 1991). In a case similar to *Johnson, Hansen* ruled that the plaintiff's employer had endorsed a third-party insurance plan. The court relied in part on the fact that the employer retained a full time employee benefits administrator who "accepted claim forms from employees and submitted them to the insurer." *Id.* at 975. It also relied on the language in the plan's sales brochure. The brochure, which carried the employer's corporate logo, described the plan to its employees as *"our plan of Group Accident Insurance"* and "a valuable supplement to your existing coverages." *Id.* at 974 (emphasis in original).

The Fifth Circuit determined that, in light of these factors, the employer's "sole function was not to allow the insurer to publicize the program and to collect premiums," and therefore that the employer "endorsed the plan, an action which the [Safe Harbor Provision] specifically forbid[s]." *Id.* By contrast, the employer in *Johnson* only included its corporate seal on its cover letter stating that the employees' enrollment decision was theirs to make. *See Johnson,* 63 F.3d at 1137. Furthermore, the sales booklet at issue in *Hansen* described the proffered plan as "the company's plan," while in *Johnson* the brochure described the policy as "a plan offered by another organization." *Id.* According to the court in *Johnson,* "[i]n the difference between 'our plan' and 'a plan' lies the quintessential meaning of endorsement." *Id.*

The *Johnson* decision was followed by *Thompson v. American Home Assurance Co.,* 95 F.3d 429 (6th Cir.1996). Like *Johnson, Thompson* emphasized employer neutrality as the "key to the rationale for not treating such a program ... as an employee benefit plan" under the Safe Harbor Provision. *Id.* at 436. Applying the reasonable employee standard articulated in *Johnson,* the *Thompson* court found that no endorsement had occurred because the employer's introductory letter "encouraging employees to obtain accident insurance ... was not printed on [the employer's] letterhead, nor did it refer to the accident insurance policy as [the employer's] plan." *Id.* at 437. Furthermore, the policy documentation "nowhere mentions that the policy is subject to ERISA, nor does it set out a description of an employee's rights under ERISA". Finally, no endorsement was found because it was unclear "whether [the employer] act[ed] as an administrator.. or whether [the employer] participated in either devising the

terms of the policy or in processing claims." *Id.* The Eleventh Circuit decided a similar case in *Butero v. Royal Maccabees Life Insurance Co.*, 174 F.3d 1207 (11th Cir.1999), in which it found that an employer had endorsed a third-party plan under the meaning of the Safe Harbor Provision because "it picked the insurer; it decided on key terms, such as portability and the amount of coverage; it deemed certain employees ineligible to participate; it incorporated the policy terms into the self-described summary plan description for its cafeteria plan; and it retained the power to alter compensation reduction for tax purposes." *Id.* at 1213–14; *see also Cecchanecchio v. Continental Cas. Co.*, 2001 WL 43783, at *3 (E.D.Pa. Jan.19, 2001) (finding that endorsement existed where an employer served as "the point of contact as the plan administrator, and, more importantly, handle[d] the filing of complaints"); *Ivanciw v. UNUM Life Ins. Co. of Am.*, 1996 WL 396685, at *2 (9th Cir. July 11, 1996) (finding endorsement where an employer "expressly reserved the right to terminate employee benefits," and required employee participation in a particular plan). *But see Bagden v. The Equitable Life Assurance Soc'y of the United States*, 1999 WL 305518, at *3 (E.D.Pa. May 11, 1999) (determining that an employer did not endorse a benefit plan when it merely "made its employees aware of the opportunity to obtain coverage, but ... did not market the plan as its own or offer it as a supplement to other programs").

Two cases in this district have also addressed the question of endorsement. First, in *Shiffler v. Equitable Life Assurance Soc'y*, 663 F.Supp. 155 (E.D.Pa.1986), *aff'd*, 838 F.2d 78 (3d Cir.1988), the court found that an employer had endorsed a third-party insurance program because the plan was "presented to employees as a plan *belonging to* [the employer's] benefits package." *Id.* at 161 (emphasis added). The court went on to explain that this fact, in conjunction with the employer providing employees the opportunity to discuss the plan with their supervisors and processing claims, "did not simply confine the insurer to publicizing the [insurance plan]." *Id.* In a later case addressing the same issue, the court followed the factors outlined in *Johnson* for determining endorsement, concluding that an employer had not endorsed a third-party plan where employees selected their coverage from a range of options presented by their employer, and where an employer only occasionally "assisted in the claims process." *Byard v. QualMed Plans for Health, Inc.*, 966 F.Supp. 354, 360 (E.D.Pa.1997). The *Byard* court also distinguished, among others, *Shiffler* and *Hansen*. It distinguished *Shiffler* because the plan at issue in that case was "presented to employees as a plan belonging to [the employer's] benefits package." *Id.* at 361. It distinguished *Hansen* on the ground that, unlike the employees in *Byard*, the employees in *Hansen* "received a booklet embossed with the corporate logo which described the policy as the company's plan." *Id.*

The facts of the situation at hand contain similarities to each of the cases cited above. Whereas it does not appear that PSEA made any decision regarding claims or in any way participated in the drafting or administration of the LTC plan, it also seems clear that PSEA both permitted its "PSEA Endorsed Special Services" logo to be included on the LTC policy's sales brochure and referred multiple times to the LTC policy as part of PSEA's own employee benefits package. While under cases such as *Johnson* and *Byard* it may appear as if PSEA did not endorse UNUM's LTC policy because it performed only administrative tasks with respect to the policy, under *Hansen* and *Shiffler* it seems like

the opposite is true. We find that the availability of PSEA's logo and its reference to the LTC policy as part of PSEA's long-term employee benefits package would lead a reasonable employee to conclude that PSEA endorsed UNUM's plan within the meaning of ERISA's Safe Harbor Provision. As noted, the logo contained words indicating that PSEA expressly endorsed UNUM's LTC plan. We do not feel that the "legal significance of the facts is less [than] certain," *Johnson*, 63 F.3d at 1135 n. 3, and therefore conclude that no genuine issue of material fact exists with regard to PSEA's endorsement of UNUM's LTC policy. We likewise conclude that UNUM is entitled to judgment as a matter of law on the issue of endorsement, as PSEA's conduct was directly analogous to that found sufficient to constitute endorsement in *Hansen* and *Shiffler*. As a result, UNUM is entitled to summary judgment on the question of endorsement under the Safe Harbor Provision. Because we find that the Safe Harbor Provision does not apply to Plaintiffs' policy, we must now address the question of preemption under ERISA with regard to each of Plaintiffs' state law claims.

### 2. Preemption

■ If ERISA is applicable to Plaintiffs' claims, the question arises whether those claims are preempted by ERISA's civil enforcement provision, 29 U.S.C. § 1132(a)(1)(B)-(a)(3). Three provisions of ERISA speak expressly to the question of preemption: "Except as provided in subsection (b) of this section [the saving clause], the provisions of this subchapter ... shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a) (Preemption Clause). For the purposes of the statute, state law includes "any laws, decisions, rules, regulations, or other State action having the effect of law, of any State," including the common law developed by state courts. 29 U.S.C. § 1144(c)(1). A law relates to an employee welfare plan if it has "a connection with or reference to such a plan." *Shaw v. Delta Air Lines*, 463 U.S. 85, 96–97, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983) (footnote omitted). "[S]uits against ... insurance companies for denial of benefits, even when the claim is couched in terms of common law negligence or breach of contract, have been held to be preempted by [§ 1144(a)]." *Pryzbowski v. U.S. Healthcare, Inc.*, 245 F.3d 266, 2001 WL 292997 (3d Cir.2001) (page references unavailable) (citing *Bast v. Prudential Ins. Co. of Am.*, 150 F.3d 1003, 1007–08 (9th Cir.1998), *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941–43 (6th Cir.1995), and *Corcoran v. United HealthCare, Inc.*, 965 F.2d 1321, 1331–34 (5th Cir.1992)). Suits under Pennsylvania's Consumer Protection Law also "relate to health insurance benefits or plans, and ... implicate the contract closely enough that preemption is appropriate." *Negron v. Patel*, 6 F.Supp.2d 366, 370 (E.D.Pa.1998). At least two of Plaintiffs' claims (Counts II and III) are for denial of benefits under a breach of contract theory. The remaining claims (Counts I and IV) argue that UNUM acted improperly in forming an insurer-insured relationship with Plaintiffs. Count I claims that UNUM's LTC policy violated various provisions of Pennsylvania insurance law. Count IV argues that UNUM's conduct in entering an insurance agreement with Plaintiffs violated Pennsylvania's Consumer Protection Law, 73 Pa.Stat. § 201.1 et seq. Plaintiffs offer no argument against our finding that all four of their Counts have a "connection with or reference to" PSEA's plan. As a result, we find that all of Plaintiffs' claims "relate to" PSEA's employee benefit plan and are, therefore, preempted by ERISA under 29 U.S.C.

§ 1144(a). The remaining question, then, is whether these claims are governed by an exception to § 1144(a). We address this issue below.

### 3. Savings Clause

Plaintiffs argue that their claims are excluded from the Preemption Clause of § 1144(a) by virtue of the Savings Clause, 29 U.S.C. § 1144(b)(2)(A), which mandates that "[e]xcept as provided in subparagraph (B) [the deemer clause], nothing in this subchapter shall be construed to exempt or relieve any person from any law of any State which regulates insurance, banking, or securities."[1] The Supreme Court addressed the relationship between the Preemption and Savings Clauses in *FMC Corporation v. Holliday*, 498 U.S. 52, 58, 111 S.Ct. 403, 112 L.Ed.2d 356 (1990), when it explained that although "these provisions 'are not a model of legislative drafting' . . . [t]heir operation is nevertheless discernible." It went on to explain that the "preemption clause is conspicuous for its breadth. It establishes as an area of exclusive federal concern the subject of every state law that 'relate[s] to' an employee benefit plan governed by ERISA." *Id.* The Savings Clause, on the other hand, returns to the States the power to enforce those state laws that "regulat[e] insurance." *Id.*

A state law regulates insurance if it satisfies either prong of a two-part test first announced by the Supreme Court in *Metropolitan Life Insurance Co. v. Massachusetts*, 471 U.S. 724, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985). Recognizing that the ultimate question in analyzing the Savings Clause was one of legislative intent, *see id.* at 740, 105 S.Ct. 2380, the Court first asked "whether, from a 'common sense view of the matter,' the contested prescription regulates insurance." *UNUM Life Ins. Co. of Am. v. Ward*, 526 U.S. 358, 367, 119 S.Ct. 1380, 143 L.Ed.2d 462 (1999) (quoting *Metropolitan Life*, 471 U.S. at 740, 105 S.Ct. 2380). Second, it considered "three factors employed to determine whether the regulation fits within the 'business of insurance' as that phrase is used in the McCarran–Ferguson Act." *Id.* The three factors employed in the Act are

> First, whether the practice has the effect of transferring or spreading a policyholder's risk; second, whether the practice is an integral part of the policy relationship between the insurer and the insured; and third, whether the practice is limited to entities within the insurance industry.

*Id.; see also Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 48–49, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987). These three factors need not all be satisfied to establish that a state law regulates insurance within the meaning of the Savings Clause. Rather, they are " 'considerations [to be] weighed' in determining whether a state law regu-

---

1. The "deemer clause" is codified at 29 U.S.C. § 1144(b)(2)(B) and explains that "[n]either an employee benefit plan ... nor any trust established under such a plan, shall be deemed to be an insurance company or other insurer, bank, trust company, or investment company or to be engaged in the business of insurance or banking for purposes of any law of any State purporting to regulate insurance companies, insurance contracts, banks, trust companies, or investment companies." The Supreme Court has read this clause to "exempt self-funded ERISA plans from state laws that 'regulat[e] insurance' within the meaning of the Savings Clause." *FMC Corp. v. Holliday*, 498 U.S. 52, 61, 111 S.Ct. 403, 112 L.Ed.2d 356 (1990). We do not consider the effect of the deemer clause on Plaintiffs' claims because PSEA's benefit plan is not self-funded and there is no evidence that the Pennsylvania statutes cited by Plaintiffs merely "purport[ ] to regulate insurance companies."

lates insurance ... '[n]one of these criteria is necessarily determinative in itself.'" *Ward,* 526 U.S. at 373, 119 S.Ct. 1380 (citing *Pilot Life,* 481 U.S. at 49, 107 S.Ct. 1549 and *Union Labor Life Ins. Co. v. Pireno,* 458 U.S. 119, 129, 102 S.Ct. 3002, 73 L.Ed.2d 647 (1982)).

In their Count I, Plaintiffs argue for declaratory relief under the following Pennsylvania insurance statutes: 40 P.S. §§ 991.1105, 991.1107, and 991.1111, and 31 Pa.Code §§ 89.94 and 89.908. (*See* Compl. at ¶¶ 17–22.) In Counts II, III, and IV, Plaintiffs rely on Pennsylvania contract and consumer protection law to justify relief under their LTC policy. (*See* Compl. at ¶¶ 24–40.) We find that Plaintiffs' statutory claims in Count I are precluded from preemption under the Savings Clause, 29 U.S.C. § 1144(b)(2)(A). The remaining claims, however, do not regulate insurance within the meaning of that clause, and therefore may not be considered without some further justification to excuse ERISA preemption.

■ All of the state statutes and regulations cited by Plaintiffs in their Count I satisfy both prongs of the test articulated in *Metropolitan Life.* In *Ward,* the Supreme Court found that common sense dictated that a state law regulated insurance because "the rule, by its very terms, 'is directed specifically at the insurance industry' ... and does 'not just have an impact on [that] industry.'" *Ward,* 526 U.S. at 368, 119 S.Ct. 1380. Similarly, each of the provisions referenced by Plaintiffs is included in the title of the Pennsylvania Code marked "Insurance," and each specifically refers to long-term care insurance in its text. Moreover, none of the provisions address any other industry or area of the law beyond insurance, and we have no reason to believe that Pennsylvania courts apply these provisions in any other context. As a result, we find that

the state provisions relied on by Plaintiffs in their Count I against UNUM are directed specifically at the insurance industry, and therefore satisfy the prong one common sense test for precluding preemption under ERISA.

We likewise find that each of the state provisions survives the second prong weighing test applied by the Court in *Metropolitan Life* because two factors of that test are fully met. Sections 991.1105, 991.1107, and 991.1111, as well as 31 Pa. Code § 89.94 and 89.908, satisfy the second factor because they all deal directly with the "policy relationship between the insurer and the insured." *Metropolitan Life,* 471 U.S. at 743, 105 S.Ct. 2380. Section 991.1105 addresses disclosure requirements for the sale of long-term care insurance policies. Section 991.1107 deals with standards for underwriting, particularly the role of the term "preexisting condition" in long-term care policies. Section 991.1111 requires that insurers provide an "outline of coverage provisions" to prospective applicants for long-term care insurance. Section 89.94 forbids ambiguous exclusionary statements in group health insurance policies, and § 89.908 explicitly protects policyholders from "post-claims underwriting." All of these provisions also satisfy the second factor because they "change[ ] the bargain between insurer and insured." *Ward,* 526 U.S. at 374, 119 S.Ct. 1380. Each influences the formation of the relationship between the insurer and the insured, rather than simply "provid[ing] the policy holder with a remedy against the insurer." *Zimnoch v. ITT Hartford,* 2000 WL 283845, at *6 (E.D.Pa. Mar.14, 2000) (citing *Tutolo v. Independence Blue Cross,* 1999 WL 274975, at *3 (E.D.Pa. May 5, 1999)). All of the aforementioned provisions also satisfy the third factor, namely that a state law be limited to entities within the insurance industry.

As mentioned in our common sense analysis, each provision refers specifically and exclusively to the insurance industry, thereby satisfying the third factor. Because we find that the state laws cited by Plaintiffs satisfy the last two factors of the test, we find under the weighing test of the second prong that the regulations fit under the "business of insurance." We therefore find it unnecessary to continue our analysis by reviewing the effect of each provision on a policyholder's risk. We instead conclude that the laws satisfy both prongs of *Metropolitan Life* and therefore that they regulate insurance for the purpose of precluding their preemption under ERISA.

■ By contrast, Plaintiffs' claims in Counts II, III, and IV under Pennsylvania contract and consumer protection law are precisely the sort of state law claims that have been deemed not to fall within the "regulate insurance" language of § 1144(b)(2)(B). In *Pilot Life*, the Supreme Court found that Mississippi's "law of bad faith" did not fall under the Savings Clause because, "even though the Mississippi Supreme Court has identified its law of bad faith with the insurance industry, the roots of this law are firmly planted in the general principles of Mississippi tort and contract law. Any breach of contract, and not merely breach of an insurance contract, may lead to liability for punitive damages under Mississippi law." *Pilot Life*, 481 U.S. at 50, 107 S.Ct. 1549. Like Mississippi's bad faith law, the Pennsylvania laws cited by Plaintiffs in their last three Counts are in no way exclusive to the insurance law context. Common sense does not indicate that they are "directed specifically at the insurance industry," but rather that they at best "just have an impact on [that] industry." *Ward*, 526 U.S. at 368, 119 S.Ct. 1380 (citing *Pilot Life*, 481 U.S. at 50, 107 S.Ct. 1549). Such

a relationship has been found insufficient to bring a state law under the coverage of the Savings Clause, and likewise prevents such laws from satisfying the third prong of the McCarron–Ferguson test, namely that a state rule be limited to entities within the insurance industry. Since we also cannot find any evidence of a relationship between the generally applicable provisions cited by Plaintiffs and either the transferring of policyholder risk or the policy relationship between an insurer and an insured, we conclude that these provisions satisfy none of the three factors in the McCarron–Ferguson Act. They therefore are not included within the scope of state law intended to be excused from ERISA preemption by the Savings Clause, and are in turn preempted by ERISA's civil enforcement provisions. We grant UNUM's motion for summary judgment with regard to Plaintiffs' preempted claims, and go on to evaluate Plaintiffs' surviving claims, namely that the LTC policy violates various provisions of Pennsylvania insurance law, on their merits.

### D. Choice of Law

■ When federal jurisdiction is based on diversity of citizenship under 28 U.S.C. § 1332, federal courts must, "[e]xcept in matters governed by the Federal Constitution or by Acts of Congress, ... [apply] the law of the State." *Erie Railroad v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). This exception has been interpreted to mean that federal diversity cases are governed both by federal procedural laws, such as the Federal Rules of Civil Procedure, *see Hanna v. Plumer*, 380 U.S. 460, 473–74, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965) ("To hold that a Federal Rule of Civil Procedure must cease to function whenever it alters the mode of enforcing state-created rights would be to disembowel either the Constitution's grant of power over federal proce-

dure or Congress' attempt to exercise that power in the Enabling Act."); *see also Henderson v. United States*, 517 U.S. 654, 668, 116 S.Ct. 1638, 134 L.Ed.2d 880 (1996) ("[A] Rule made by Congress supercedes conflicting laws no less than a Rule this Court prescribes."); *Budinich v. Becton Dickinson & Co.*, 486 U.S. 196, 199, 108 S.Ct. 1717, 100 L.Ed.2d 178 (1988); *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 6 L.Ed. 253 (1825), and by the substantive laws of the forum State, as established by that State's highest court.[2] *See Commissioner of Internal Revenue v. Bosch's*, 387 U.S. 456, 465, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967).

■ In the case at bar, because we have found that ERISA does not govern Plaintiffs' claims under Pennsylvania insurance law, such law governs the outcome. The insurance contract at issue here was completed by UNUM and made available to Mr. Schneider by virtue of his enrollment in the PSEA, an organization whose activities are limited entirely to Pennsylvania. Moreover, Mr. Schneider listed his mailing address as "1419 Grace Street, Allentown, Lehigh County, Pennsylvania, 18103." (Compl. at ¶ 1.) He purchased the policy while living in Pennsylvania, and neither party has suggested anything other than the application of Pennsylvania law in interpreting the con-

tract.[3] Finally, the policy was delivered in Pennsylvania and explicitly states that it is to be "governed by the laws of the ... jurisdiction" in which it was delivered. (App. Supp. Def's Mot. Summ. J., Exh. A at 377.) As a result, we find that the Federal Rules of Civil Procedure and Pennsylvania insurance law govern our determination of whether UNUM breached its obligations under Plaintiffs' LTC policy.

*E. Plaintiffs' Statutory Claims*

■ Plaintiffs present four separate claims that UNUM's LTC policy violated Pennsylvania insurance law. The first two involve Pennsylvania insurance regulations. *See* 31 Pa.Code §§ 89.94, 89.908. The remaining two involve Pennsylvania insurance statutes. *See* 40 Pa.Cons.Stat. §§ 991.1105(b), (c), 991.1107, and 991.1111(a), (d), (e). UNUM moves for summary judgment on these claims on the ground that no genuine issue of material fact exists and that UNUM is entitled to judgment as a matter of law on each claim. We disagree. Policy interpretation is a question of law for the court, *see Madison Constr. Co. v. Harleysville Mut. Ins. Co.*, 557 Pa. 595, 735 A.2d 100, 106 (1999); *Gene & Harvey Builders v. Pennsylvania Mfrs. Ass'n*, 512 Pa. 420, 517 A.2d 910, 913 (1986), and requires that the policy be construed as a whole in order to determine its proper application. *See, e.g., American*

2. Lower state court decisions are persuasive, but not binding, on the federal court's authority; if the State's highest court has not spoken on a particular issue, the "federal authorities must apply what *they* find to be the state law after giving 'proper regard' to relevant rulings of other courts of the State." *Id.* (emphasis added); *see also Polselli v. Nationwide Mut. Fire Ins.*, 126 F.3d 524, 528 (3d Cir.1997); *Scranton Dunlop, Inc. v. St. Paul Fire & Marine Ins. Co.*, 2000 WL 1100779, at *1 (E.D.Pa. Aug.4, 2000) ("Since this is a matter of state law that has not been decided by the Pennsylvania Supreme Court, a prediction

must be made as to how that court would rule if confronted with the same facts.").

3. Although we recognize the rule that any choice of law issues are resolved as required by the laws of the forum State, *see Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *see also Day & Zimmerman, Inc. v. Challoner*, 423 U.S. 3, 96 S.Ct. 167, 46 L.Ed.2d 3 (1975), we refrain from performing a detailed analysis under Pennsylvania's complex choice of laws doctrine in the case at bar due to Pennsylvania's clearly predominant role in the events leading up to this case.

Planned Cmtys., Inc. v. State Farm Ins. Co., 28 F.Supp.2d 964, 965 (E.D.Pa.1998); Frith v. Comprehensive Benefits Servs., 1993 WL 331936, *2 (E.D.Pa. Aug.20, 1993); Giancristoforo v. Mission Gas & Oil Prods., Inc., 776 F.Supp. 1037, 1041 (E.D.Pa.1991); Luko v. Lloyd's London, 393 Pa.Super. 165, 573 A.2d 1139, 1142 (1990). In determining whether claims could potentially come within the scope of a policy, we look solely to the allegations of the complaint in the underlying action. See, e.g., Pacific Indem. Co. v. Linn, 766 F.2d 754, 760 (3d Cir.1985); I.C.D. Indus., Inc. v. Federal Ins. Co., 879 F.Supp. 480, 487–88 (E.D.Pa.1995) (noting that Pennsylvania courts generally evaluate underlying complaints on their face and citing cases rejecting liberal interpretation).

Plaintiffs' first claim argues that the LTC policy's exclusion of persons that are "totally disabled," relied on by UNUM to exclude Mr. Schneider from coverage, is impermissible under 31 Pa.Code § 89.94, which prohibits coverage exclusions which are "ambiguous or unfairly discriminatory." Plaintiffs do not cite, nor is this Court able to locate, any administrative or other rulings interpreting the language of § 89.94. As a result, we interpret the plain meaning of the provision in light of the arguments presented by both parties. See Commonwealth Dep't of Envtl. Res. v. Rannels, 148 Pa.Cmwlth. 182, 610 A.2d 513, 515 (1992) ("It is a well recognized rule of statutory construction that when the words of a statute are free and clear from all ambiguity, the letter of the provision is not to be disregarded under the pretext of its spirit . . . These same principles apply to [administrative agencies'] regulations as well." (citing Zimmerman v. O'Bannon, 497 Pa. 551, 442 A.2d 674 (1982) and 1 Pa. Cons.Stat. § 1921(b))).

A similar approach applies to insurance policy language. See Williams v. Nationwide Mut. Ins. Co., 750 A.2d 881, 886 (Pa.Super.2000) ("We cannot rewrite an insurance contract or construe the language of a clear insurance contract provision to mean something not established by the plain meanings of the words used." (citing Nationwide Mut. Ins. Co. v. Cummings, 438 Pa.Super. 586, 652 A.2d 1338, 1341 (1994))). A provision in an insurance contract has been deemed ambiguous if "reasonably intelligent" people, on considering it in the context of the entire policy, would "honestly differ as to its meaning." Northbrook Ins. Co. v. Kuljian Corp., 690 F.2d 368, 372 (3d Cir.1982) (citing Celley v. Mutual Benefit Health & Accident Assoc., 229 Pa.Super. 475, 324 A.2d 430, 434 (1974)). We find the definition of ambiguous as set forth in Northbrook to be consistent with the plain meaning of the term ambiguous as set forth in 31 Pa.Code § 89.94.

UNUM's LTC policy defines "totally disabled" persons as those that "because of an injury or a sickness . . . are unable to perform each of the duties or activities of a person of the same age and sex in good health." (Pls' Exhs. Opp'n Def's Mot. Summ. J., Exh. E at C–11.) Plaintiffs argue that UNUM's definition of "totally disabled" is inherently ambiguous and discriminatory toward those with permanent disabilities. For the purposes of the motion before us, we will consider the facts in a light most favorable to Plaintiffs. At the time of his enrolling in UNUM's LTC plan, Mr. Schneider was aware of, and forthright about, his multiple sclerosis. (See Pls' Answer Opposing Def's Mot. Summ. J. at 2.) He obtained a letter from his doctor deeming him able to work. (See App. Supp. Def's Mot. Summ. J., Exh. A at 158.) He swore under oath in his own deposition that he shared the extent of his physical limitations with a UNUM representative before enrolling in the LTC

plan and was assured that he would be covered. (*See* Pls' Exhs. Opp'n Def's Mot. Summ. J., Exh. C at 13–21.) Nevertheless, UNUM argues that the policy's definition of "totally disabled" was sufficiently clear to notify Mr. Schneider that, despite his conversations with UNUM representatives, he was in fact never covered by the policy.[4] UNUM also contends that Mr. Schneider suffered from decreased mobility and had difficulty preparing meals at the time of his enrollment, and that these symptoms are evidence that was totally disabled within the meaning of the policy. (*See* App. Supp. Def's Mot. Summ. J., Exh. A at 226, 232, 416.) At this point in time, we believe that the differences in opinion between Mr. Schneider's physician, the initial UNUM representative that Mr. Schneider spoke to, and UNUM's claims department demonstrates the ability of "reasonably intelligent people to honestly differ" as to the proper meaning of the LTC policy's definition of "totally disabled." Furthermore, the policy language makes it possible for UNUM to disqualify any insured who at the time of enrollment was unable to perform "*each* of the duties or activities of a person of the same age and sex in good health." Taken literally,

this language could unfairly exclude a large number of insureds.[5] Such a situation is unacceptable because, among others, it transfers a disproportionate amount of risk to policyholders. We therefore conclude that such policy language is ambiguous and must be construed against the insurer. We also find for the purposes of the motion before us that Mr. Schneider should not be denied coverage due to this ambiguous policy provision. As a result, we must deny UNUM's motion for summary judgment under § 89.94.

■ Even if we did not find the LTC policy's "totally disabled" exclusion invalid, however, we would nevertheless deny UNUM's motion for summary judgment with regard to Plaintiffs' three remaining claims under Pennsylvania insurance law. Plaintiffs' second claim asserts that UNUM's reliance on the "totally disabled" policy exclusion after offering the LTC policy to Mr. Schneider on an open enrollment basis constitutes "post-claims underwriting" in violation of 31 Pa.Code § 89.908(d). (Pls' Answer Opposing Def's Mot. Summ. J. at 4.) Section 89.908(d) states that:

> An insurer or other entity engaged in the sale of long-term care insurance may

4. UNUM also argues that the "totally disabled" language of the policy was permissible because it was approved by the Pennsylvania Department of Insurance. (*See* Mem. Law Supp. Def's Mot. Summ. J. at 20–21.) Although Plaintiffs claim that this approval occurred before the policy language was amended, and therefore does not represent the Department's official acceptance of the entire policy, we need not resolve this debate. Approval by Pennsylvania's Department of Insurance does not "per se establish the validity of the particular provision.... If a court determines that a challenged provision is void as being contrary to law, then the approval itself is invalid as well, since such approval exceeds the power granted to the Commissioner." *Brader v. Nationwide Mut. Ins. Co.*, 270 Pa.Super. 258, 411 A.2d 516, 517 (1979) (citing *Wilbert v. Harleysville Mut. Ins. Co.*,

254 Pa.Super. 217, 385 A.2d 987, 992 (1978)). We are therefore not bound by any decisions of the Commissioner, and find UNUM's argument regarding the Commissioner's approval unpersuasive as to the policy's validity.

5. For instance, if an insured who wears eyeglasses took advantage of UNUM's open enrollment procedure, would he be unable to perform *each* of the duties or activities of another of his age and gender in good health if he could not read important documents without the glasses? It is not difficult to imagine countless other minor disabilities which would prevent an otherwise healthy person from performing "*each* of the duties or activities of a person of the same age and sex in good health."

not issue a policy or certificate until the insurer or other entity applies its underwriting standards and has determined the policyholder to be an acceptable risk. According to Plaintiffs, UNUM's offer of an open enrollment period to PSEA members constituted issuance of the LTC policy, and therefore precluded UNUM from later applying the "totally disabled" underwriting standard to deny Mr. Schneider benefits. They argue that UNUM's open enrollment policy permitted them to charge a higher premium due to the lack of a formal application process, and therefore that applying the "totally disabled" exclusion to Mr. Schneider unfairly benefitted UNUM by preventing UNUM from needing the higher premiums to offset Mr. Schneider's medical risks. (*See* Pls' Answer Opposing Def's Mot. Summ. J. at 4 n. 1.) UNUM responds by arguing that the LTC policy was not deemed invalid with regard to Mr. Schneider due to underwriting criteria, but instead that Mr. Schneider was never covered at all by virtue of his failure to survive the policy's exclusion of applicants who are "totally disabled."

The question, then, is whether Mr. Schneider's multiple sclerosis precluded him from coverage in the first place. UNUM presents evidence that, at the time of Mr. Schneider's open enrollment in UNUM's LTC plan, he was not able to perform the daily functions of a person of his age and gender and in good health. According to UNUM, Mr. Schneider was unable to work or prepare his own meals, and required a wheelchair for much of his transportation at the time his coverage became effective on February 1, 1995. (*See* App. Supp. Def's Mot. Summ. J., Exh. A at 226, 232, 416.) Plaintiffs argue that Mr. Schneider was not totally disabled at that time, referring to correspondence from Mr. Schneider's physician to UNUM stating that Mr. Schneider did not become totally disabled until November 30, 1995,

nearly ten months after his LTC policy became effective. (*See id.* at 158, 215.) They also provide evidence that Mr. Schneider twice informed UNUM that he has MS and explained the extent of his physical limitations. Mr. Schneider asked UNUM's representative on both occasions if his condition would jeopardize his coverage under the LTC plan and was told both times that his coverage would not be affected by his disease. (*See* Pls' Exhs. Opp'n Def's Mot. Summ. J., Exh. C at 13–21.) We find that these conflicting accounts of Mr. Schneider's condition and UNUM's reaction thereto constitute genuine issues of material fact with regard to whether Mr. Schneider satisfied UNUM's definition of "totally disabled" at the time his LTC policy became effective on February 1, 1995. Such issues are for the factfinder to resolve, not the courts on summary judgment. As a result, we deny UNUM's motion for summary judgment on this ground.

■ Plaintiffs' third claim contends that UNUM's exclusion of people who are "totally disabled" under the definition included in the LTC policy language violates 40 Pa Stat. §§ 991.1105(b)(1), (c)(1)-(2), and 991.1107. Section 991.1105 reads, in pertinent part:

(b) No long-term care insurance policy may:

(1) be canceled, nonrenewed or otherwise terminated on the grounds of the age or the deterioration of the mental or physical health of the insured individual or certificate holder; . . .

(c) (1) No long-term care insurance policy or certificate may use a definition of "preexisting condition" which is more restrictive than a definition of "preexisting condition" that means a condition for which medical advice or treatment was recommended by or re-

ceived from a provider of health care services within six months preceding the effective date of coverage of an insured person.

(2) No long-term care insurance policy may exclude coverage for a loss or confinement which is the result of a preexisting condition unless such loss or confinement begins within six months following the effective date of coverage of an insured person.

Section 1107 states that

The definition of the term "preexisting condition" under section 1105(c) does not prohibit an insurer from using an application form designed to elicit the complete health history of the applicant and, on the basis of the answers on that application, from underwriting in accordance with that insurer's established underwriting standards ... No long-term care insurance policy or certificate may exclude or use waivers or riders of any kind to exclude, limit or reduce coverage or benefits for specifically named or described preexisting diseases or physical conditions beyond the waiting period described in section 1105(c)(2).

Both provisions are unambiguous and therefore should be interpreted together and in accord with their plain meaning. *See Williams*, 750 A.2d at 886; *Rannels*, 610 A.2d at 515 ("Statutory provisions must also be read together and construed with reference to the entire act, and no provision should be construed in such a way as to render some other provision without effect."). According to Plaintiffs, these two provisions clearly state that, in cases in which no application form was required by an insurer (i.e. situations involving open enrollment), no "loss or confinement" resulting from a preexisting condition may be excluded from coverage more than six months after the insured's policy became effective. In Mr. Schneid-

er's case, even if the "totally disabled" exclusion was considered facially valid, his loss occurred roughly three years after his coverage under the LTC policy became effective. As a result, Plaintiffs argue, sections 991.1105 and 991.1107 prohibit UNUM from applying the exclusion to Mr. Schneider's condition. UNUM provides no response to Plaintiffs' claim other than to reiterate that the policy language was approved by the Pennsylvania Department of Insurance. *But see Brader*, 411 A.2d at 517. We agree with Plaintiffs' interpretation of the effects of these two provisions. However, as with Plaintiffs' claim under 31 Pa.Code § 89.908(d), the resolution of this claim depends on whether Mr. Schneider was "totally disabled" at the time of his enrollment in the LTC plan. Because we find that there exist genuine issues of material fact with respect to that question, we deny UNUM's motion for summary judgment on that ground.

 Fourth, Plaintiffs maintain that UNUM "did not tell Mr. Schneider that the definition of 'Total Disability' in [the LTC policy's] Certificate of Coverage was phrased as quoted [above]." (Compl. at ¶ 17.) Plaintiffs argue that this omission is a violation of Pennsylvania insurance law as set out in 40 Pa.Cons.Stat. § 9711.1111(a), (d), (e). Section 9711.1111(a) mandates that

An outline of coverage shall be delivered to a prospective applicant for long-term care insurance at the time of initial solicitation through means which prominently direct the attention of the recipient to the document and its purpose.

Sections 9711.1111(d) and (e) further explain this requirement:

(d) In the case of direct response solicitations, the outline of coverage must be presented in conjunction with any application or enrollment form.

(e) The outline of coverage shall include all of the following:

(1) A description of the benefits and coverage provided in the policy.

(2) A statement of the exclusions, reductions and limitations contained in the policy.

(3) A statement of the terms under which the policy or certificate may be continued in force or discontinued, including any reservation in the policy of a right to change premium. Continuation or conversion provisions of group coverage shall be specifically described.

(4) A statement that the outline of coverage is a summary only, not a contract of insurance, and that the policy or group master policy contains governing contractual provisions.

(5) A description of the terms under which the policy or certificate may be returned and premium refunded.

(6) A brief description of the relationship of cost of care and benefits.

UNUM moves for summary judgment on this claim on the grounds that there exists no genuine issue of material fact and that UNUM is entitled to judgment as a matter of law on this issue. We disagree. Plaintiffs present at least two pieces of evidence demonstrating that an outline of coverage provisions was not sent to Mr. Schneider in accordance with the requirements of § 9711.1111. (*See* Pls' Exhs. Opp'n Def's Mot. Summ. J., Exh. C at 12, Exh. F at P–1 to P–6.) UNUM offers copies of the materials that it claims were received by all members of PSEA as part of the marketing of UNUM's LTC plan. (*See, e.g.,* App. Supp. Def's Mot. Summ. J., Exh. A at 341–37, 291–87.) We find that there exists a genuine issue as to exactly what Mr. Schneider received prior to enrolling in the LTC plan, and as to exactly what information (if any) those materials

contained regarding the scope of the coverage offered by UNUM to Mr. Schneider. Because the answer to both of these questions is factual, we cannot properly analyze UNUM's conduct under § 9711.1111 until such issues are resolved. We therefore deny UNUM's motion for summary judgment on this claim.

## IV. CONCLUSION

UNUM moved for summary judgment with respect to all four of the Counts listed in Plaintiffs' Complaint. Because we find that ERISA preempts the state law contract and consumer protection claims contained in Counts II, III, and IV, we grant UNUM's motion with respect to these claims. We deny UNUM's summary judgment motion, however, with regard to Plaintiffs' claims in Count I under Pennsylvania insurance law. The Savings Clause excuses state insurance regulations, including those cited by Plaintiffs in Count I, from preemption. Furthermore, Plaintiffs presented sufficient evidence in connection with each claim in Count I to demonstrate either the existence of a genuine issue of material fact or, in cases where the relevant facts were not disputed, that Plaintiffs were entitled to judgment as a matter of law with respect to a particular claim. We therefore grant UNUM's motion for summary judgment in part and deny it in part. We also grant Plaintiffs time to amend their existing Complaint to include claims under ERISA's civil enforcement provisions, 29 U.S.C. § 1132(a)(1)(B)-(a)(3).

An appropriate order follows.